1
2
3
4
5
6
7
8

9               **IN THE UNITED STATES DISTRICT COURT**

10              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

11

12   JOSE LOZANO,                              CASE NO. CV F 05-0096 LJO

13                    Plaintiff,              **DECISION ON SOCIAL SECURITY**
                                              **COMPLAINT**
14          vs.                               (Doc. 11.)

15   JO ANNE B. BARNHART,
     Commissioner of Social
16   Security,

17                    Defendant.
                                        /
18

19                            **INTRODUCTION**

20          Plaintiff Jose Lozano ("plaintiff") seeks this Court's review of an administrative law judge's

21   ("ALJ's") decision that plaintiff is not disabled and is ineligible for Supplemental Security Income

22   ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1382c.  Pursuant to 28

23   U.S.C. § 636(c) and F.R.Civ.P. 73, the parties agreed to proceed before a United States Magistrate

24   Judge, and by a June 13, 2005 order, this action was assigned to United States Magistrate Judge

25   Lawrence J. O'Neill for all proceedings.  Based on review of the Administrative Record ("AR") and the

26   papers of plaintiff and defendant Jo Anne B. Barnhart, Commissioner of Social Security

27   ("Commissioner"), this Court DENIES plaintiff's request to reverse the Commissioner's decision to

28   deny plaintiff SSI or to remand for further proceedings.

                                            1

## BACKGROUND

### Personal Background

Plaintiff is age 41, has a ninth grade Mexican education, is literate in Spanish, not English, and is unable to communicate readily in English. (AR 18, 144.) Plaintiff has past relevant work as a cement and asphalt worker, construction helper, and clean-up worker. (AR 18, 146, 157, 341.) Plaintiff has worked part-time as a dishwasher and cattle feeder. (AR 18.)

### Administrative Proceedings

On July 26, 2000, plaintiff filed his SSI application to claim disability since July 1, 2000 due to mental illness and schizophrenia. (AR 136, 145.) With its November 15, 2000 Notice of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent plaintiff to work. (AR 122.) On December 28, 2000, plaintiff filed his Request for Reconsideration to claim he had a Mexican doctor's statement to strengthen his case and a doctor who is willing to testify for plaintiff. (AR 126.) With its April 16, 2001 Notice of Reconsideration, SSA denied plaintiff's claim and again determined that plaintiff's condition is not severe enough to prevent him to work. (AR 127.)

On May 11, 2001, counsel was appointed for plaintiff. (AR 58.) On May 15, 2001, plaintiff filed his Request for Hearing by Administrative Law Judge to claim he is "still disabled." (AR 131.) After a March 11, 2002 hearing, the ALJ issued his April 23, 2002 decision to find plaintiff is not disabled and to conclude that: (1) plaintiff has the residual functional capacity to perform all exertional levels and to understand, remember and carry out simple one or two-step job instructions; and (2) plaintiff's bipolar disorder with psychotic features do not prevent him to perform his past relevant work as a cattle feeder. (AR 397, 398.)

On May 28, 2002, plaintiff filed with SSA's Appeals Council his Request for Review of Hearing Decision/Order and his counsel's letter brief to challenge the ALJ's April 23, 2002 decision. (AR 403.) With its March 21, 2003 order, the Appeals Council vacated the ALJ's decision and remanded to the ALJ to:

1.    Address a consulting psychiatrist's indication that plaintiff is unable to engage in work without special or additional supervision;

2

2.      Obtain updated treating medical records;

3.      Obtain evidence from a psychiatrist or psychologist to clarify the nature and severity of plaintiff's impairments;

4.      Consider further an examining source opinion and explain weight given to such opinion; and

5.      Evaluate further plaintiff's mental impairments.  (AR 400-401.)

After an August 7, 2003 remand hearing, the ALJ issued his September 9, 2003 decision to find plaintiff is not disabled and to conclude that although plaintiff is unable to perform his past relevant work, he has residual functional capacity to perform work without exertional limitations and is able to understand, remember and carry out simple instructions with ordinary supervision and to interact appropriately with others in worklike situations.  (AR 24.)

On October 23, 2003, plaintiff filed with the Appeals Council his Request for Review of Hearing Decision/Order to challenge the ALJ's September 9, 2003 decision.  (AR 14.)  Plaintiff submitted additional evidence for his claim.  On October 6, 2004, the Appeals Council denied plaintiff's request for review to render the ALJ's September 9, 2003 decision as the Commissioner's final decision subject to this Court's review.  (AR 7.)

## Medical History And Records Review

### *Alameda County Medical Center*

On January 22, 1999, plaintiff was admitted to the John George Psychiatric Pavilion of the Alameda County Medical Center "due to being violent with family members and refusing to take meds." (AR 239.)  Plaintiff noted he had not taken his Lithium and Haldol for several months.  (AR 239.) Intake notes reflect that plaintiff was paranoid about the Maffia being after him and spoke of having "special powers from GOD" and about the Devil.  (AR 239.)  Plaintiff presented as "very animated and labile," exhibited an anxious, elevated and labile mood/affect and delusions.  (AR 239.)  Plaintiff was noted to be a danger to others but not himself.  (AR 240.)  Plaintiff was diagnosed with Psychotic Disorder, not otherwise specified, and assessed a 35 Global Assessment of Functioning ("GAF"). Plaintiff was later characterized as loose, grandiose, delusional and as making little sense.  (AR 241.) Plaintiff's diagnosis was changed to Schizoaffective Disorder, and he was started on Haldol.  (AR 241.)

3

A January 23, 1999 initial evaluation described plaintiff as violent toward his family, hostile, delusional, hypomanic and off his medication for several months. (AR 225, 226.) January 23, 1999 notes reflect plaintiff was physically aggressive with family members and non-compliant with medication. (AR 230.) The treatment plan included to monitor plaintiff's mood and behavior and to explain to him the importance of medication compliance. (AR 230.) Plaintiff was diagnosed with psychosis. (AR 229.)

According to late January 1999 notes, plaintiff was manic, delusional, religiously preoccupied, grandiose, and hypersexual. (AR 211.)

On February 4, 1999, plaintiff was discharged with prescriptions of Cogentin 2 mg, Depakote 1000 mg, Haldol 10 mg, and Ativan 2 mg and diagnosed with Schizoaffective Disorder. (AR 204, 207, 218, 220-222, 238.) Plaintiff's prognosis was fair, and he was assessed a 50 GAF. (AR 238.) The discharge summary reflected that plaintiff was medication compliant and subacute, was less delusional, grandiose and impulsive, had more euthymic and appropriate mood, exhibited slight paranoia, was "a little bit disorganized in his thinking," was able to attend groups, be appropriate with peers and staff, and outline a reasonable care plan, and was goal directed and appropriate in thinking and conversation. (AR 206.)

### *Centro De Neuropsiquiatria – Mexican Psychiatric Hospitalization*

On April 4, 2000, plaintiff was admitted and brought to the Centro de Neuropsiquiatria (neuropsychiatry center) in Agusascalientes, Mexico by family and police due to aggressiveness. (AR 256, 259.) According to April 4, 2000 notes, plaintiff's condition started at age 28 when he demonstrated aggressiveness, irritability, demonomania and impulsiveness. (AR256, 259.) The notes reflect that plaintiff was treated in Mexico with Lithium by a psychiatrist and "has been partially under control," but a month prior to admission, plaintiff began drinking alcohol and stopped taking his medication. (AR 256, 259.) Plaintiff was required to be restrained because of agitation and was diagnosed with Type II Bipolar Disorder. (AR 257, 259.) April 4, 2000 notes further reflect that plaintiff had a stable sleep pattern and no side effects from medication. (AR 255.) As of April 6, 2005, plaintiff was tranquil, improved, coherent and not irritable but showed delusions of grandeur. (AR 255.) April 7 and 9, 2000 notes reflect that plaintiff refused medication and became threatening. (AR 255.)

As of April 9, 2000, plaintiff slept and ate well, displayed an arrogant attitude and unawareness of his illness, and was coherent and congruent. (AR 254.) Haldol 30 mg and Levomepromazine 50 mg were prescribed. (AR 254.) August 12, 2000 notes reflect that plaintiff was tranquil, alert and cooperative. (AR 253.)   As of April 14 and 15, 2000, plaintiff had "improved markedly," was more tolerant, manageable, accepting of medication and aware of his illness, was tranquil, cooperative and coherent, was neither irritable, aggressive nor impulsive, and had neither hallucinations nor delusions. (AR 252.) As of April 18, 2000, plaintiff appeared "asymptomatic" and was tranquil and cooperative. (AR 250.) Plaintiff accepted his medication with no side effects. (AR 250.) On April 26, 2000, plaintiff was released with a diagnosis of Affective Bipolar Disorder F31, was adequately aware of his illness, and showed no psychotic symptomology. (AR 250, 461.)

### *Tulare County Mental Health Services – Treating Physicians*

On September 11, 2000, plaintiff voluntarily presented to Tulare County Mental Health Services and reported that he was then stable but had experienced in April 2000 depressed mood, insomnia, racing thoughts, paranoia, delusions, fatigue, and loss of interest in pleasurable activities. (AR 338.) Plaintiff further indicated that he was running out of medication and wanted to maintain stability. (AR 347.) A social worker-completed intake form noted plaintiff's coherent speech, appropriate content, adequate productivity, normal thought content, intellect, insight and judgment (although somewhat impaired at times). (AR 342, 343.) According to the intake form, plaintiff was "very motivated" for treatment and appeared to have adequate coping skills and symptoms of schizophrenia and being bipolar with psychotic features. (AR 344.) The intake form attributed plaintiff to indicate that he was unable to work. (AR 344.) The intake form's diagnosis was Bipolar I Disorder most recent episode manic severe with psychotic features and rule out schizophrenia undifferentiated type. (AR 345.)

The social worker also completed a September 11, 2000 care plan form to note plaintiff's goals to reduce/eliminate insomnia, irritability, and flight of ideas. (AR 348, 349.) The form noted further goals to increase plaintiff's employability by stabilizing his symptoms within six months and to increase his ability to communicate in English. (AR 354.) Plaintiff was instructed to meet with a vocational rehabilitation counselor, to participate in a job club, to follow vocational rehabilitation directives, and to attend adult school to learn English. (AR 354.) The form states plaintiff "will be gainfully employed

in 6 mos." (AR 356.) Plaintiff was assessed a 52 Global Assessment of Functioning ("GAF"). (AR 358.) The social worker completed a September 20, 2000 medical report to indicate that plaintiff would be released for work or training in June 2001, his diagnosis of bipolar and anxiety and "ongoing" prognosis. (AR 337.)

On September 20, 2000, plaintiff treated with Ruth Ragucci, M.D. ("Dr. Ragucci"), who noted plaintiff's complaints of sleeping difficulty, fear and suspicion of other people, feelings of hopelessness, difficulty to focus, and slightly impaired concentration. (AR 335, 459.) Dr. Ragucci diagnosed Bipolar Disorder, mixed, with partial remission and recommended to obtain lithium level and adjust dose accordingly and to taper Haloperidol. (AR 336, 460.) On September 27, 2000, Dr. Ragucci assessed that plaintiff would have poor compliance with Lithium and thus prescribed Lithobid 300 mg. (AR 334.)

On October 18, 2000, plaintiff treated with Andrew Zabiega, M.D. ("Dr. Zabiega"), who noted plaintiff had not been doing well on current medications, except Lithium which decreased plaintiff's depression although plaintiff was somewhat angry and occasionally agitated. (AR 333.) Dr. Zabiega noted plaintiff's good expression, normal mood and affect, and fair insight and judgment along with the absence of delusions, hallucinations or paranoia. (AR 333.) Dr. Zabiega corroborated the diagnosis of Bipolar Disorder mixed with partial remission and continued plaintiff on Lithium. (AR 333.) On November 16, 2000, Dr. Zabiega noted that plaintiff "is doing very well" and "thinks the medications are working well." (AR 332.) Dr. Zabiega noted plaintiff's informative speech, good expression, normal mood and affect, fair insight and judgment, and the absence of delusions, hallucinations and paranoia. (AR 332.) Dr. Zabiega continued plaintiff on Paxil 30 mg in the morning, Ambien for sleep and Lithium 300 mag twice a day. (AR 332.)

On January 18, 2001, Dr. Zabiega noted that plaintiff was "relatively stable on current medications. However, he falls asleep again and awakens late and is irritable." (AR 331.) Dr. Zabiega noted plaintiff's informative speech, good expression, normal mood and affect and good judgment and insight. (AR 331.) Dr. Zabiega further noted plaintiff was neither suicidal nor homicidal and lacked delusions, hallucinations and paranoia. (AR 331.) Dr. Zabiega recommended Paxil 30 mg in the evening, Lithium three times a day for a 900 mg total dosage, and to discontinue Ambien. (AR 331.) On March 19, 2001, plaintiff treated with Paul Bong, M.D. ("Dr. Bong") and reported increased

restlessness, walking and pacing behavior, fear and paranoia.  (AR 330.)  Dr. Bong noted plaintiff's expression of linear thought processes, euthymic mood, blunted affect, and "some paranoid ideation."  Dr. Bong noted the absence of acute distress and agitation.  (AR 330.)  Dr. Bong's treatment plan included starting plaintiff on antipsychotic medication and Zyprexa and continuing Paxil, Hydroxyzine and Restoril 15 mg.  (AR 330.)  On April 12, 2001, plaintiff presented to the emergency room as his family requested evaluation of his medication and nervousness.  (AR 363, 364.)  Plaintiff indicated that he believed he was taking too much medicine and sleeping to much.  (AR 363, 364.)  Plaintiff was released and not admitted with instructions to contact his treating practitioners.  (AR 364.)On April 16, 2001, plaintiff admitted that he angered when family members told him he was crazy.  (AR 329.)  Plaintiff complained of dizziness from Restoril, Zyprexa and Hydroxyzine.  (AR 329.)  Plaintiff noted that he tolerated Lithium.  (AR 329.)  Dr. Bong noted plaintiff's fair relatedness, euthymic mood with constricted affect, linear thought processes, and limited insight and judgment.  (AR 329.)  Dr. Bong noted "some delusional type of thinking" but the absence of acute distress and agitation.  (AR 329.)  Dr. Bong's probable diagnosis was Schizoaffective Disorder.  (AR 329.)  Dr. Bong switched plaintiff's antipsychotic medication from Zyprexa to Haldol 10 mg, increased his Lithium from 600 mg twice a day to 900 mg twice a day, and discontinued Restoril and Hydroxyzine.  (AR 329.)

On May 11, 2001, plaintiff complained of "lots of depression, only wanting to be lying down" during the past three weeks.  (AR 366.)  Plaintiff noted his helpless feelings, low energy and easy distraction and irritability.  (AR 366.)  However, notes reflect plaintiff was "alert and oriented."  (AR 360.)  On May 11, 2001, Dr. Zabiega noted plaintiff's goal directed speech, good eye contact, euthymic mood, pleasant and bright affect and good insight and judgment as well as absence of signs of psychotic or delusional disorder.  (AR 328.)  Dr. Zabiega diagnosed Bipolar Disorder with psychotic features, prescribed Lithium Carbonate 300 mg three times a day, Neurontin 800 mg twice a day and Risperidone 3 mg as a mood stabilizers, and Doxepin 200 mg for depression.  (AR 328.)  Dr. Zabiega discontinued Haldol, Cogentin and Ambien.  (AR 328.)  On May 31, 2001, Dr. Zabiega noted that plaintiff "is doing relatively well" and that his condition is stable.  (AR 367.)  Dr. Zabiega observed plaintiff's alertness, cooperation, intact cognitive functions, goal-oriented speech, good eye contact, euthymic mood, pleasant and appropriate affect, and good insight and judgment.  (AR 367.)  Dr. Zabiega noted the absence of

signs of psychotic or delusional disorder and diagnosed Bipolar Disorder with psychotic features. (AR 367.) Dr. Zabiega continued plaintiff on Risperidone 3 m.g. for mood stabilization, Lithium Carbonate 300 mg, and Neurontin 800 mg. (AR 367.)

Dr. Zabiega completed a June 1, 2001 impairment questionnaire to note his diagnosis of Bipolar Disorder severe manic phase delusional component and 35 GAF assessment. (AR 317.) Dr. Zabiega noted his "poor" prognosis in that plaintiff "cannot function without assistance." (AR 317.) As to more frequent and/or severe symptoms, Dr. Zabiega noted delusions, poor insight, judgment, memory and concentration. (AR 319.) According to Dr. Zabiega, plaintiff was markedly limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation. (AR 320-322.) Dr. Zabiega noted that plaintiff "is delusional, paranoid, unable to earn money, and function without supervision." (AR 323.) Dr. Zabiega estimated plaintiff would miss work less than once a month due to his impairments or treatment. (AR 324.)

Dr. Zabiega prepared a July 11, 2001 letter, addressed to plaintiff's counsel, and noted plaintiff's treatment for mood swings, insomnia, racing thoughts, paranoid ideation, delusions, fatigue and lost interest in daily activities. (AR 314.) In his letter, Dr. Zabiega outlined plaintiff's treatment, assessed Bipolar Disorder with psychotic features and success of Lithium Carbonate, and noted:

> Apparently, from judging by his diagnosis, the patient has severe limitations in concentration, attention, and his insight and judgment does [sic] not seem to be appropriate. He needs supervision, including with management of his funds. He probably will need treatment for all his life, as his prognosis is poor. . . .
>
>   . . .
>
> In my opinion, the patient has chronic mental illness which requires lifelong treatment for his disturbed function. He requires supervision and his prognosis for recovery is poor. (AR 315, 316.)

On August 1, 2001, plaintiff reported he felt better after stopping Neurontin which make him "dopey." (AR 369.) Plaintiff denied voices and visions. (AR 369.) On August 30, 2001, plaintiff voiced "no concerns" and was noted to be "fairly stable" on Lithium Carbonate and Neurontin and to have sleeping difficulty. (AR 370, 371.) Plaintiff was assessed with Bipolar Disorder and continued on Lithium Carbonate 600 mg and Zyprexa 10 mg. (AR 370.) According to an October 3, 2001 community functioning evaluation form, plaintiff lived with his sister, took walks to the park, and relied

on his sister for buying food, cooking and cleaning. (AR 378.)

On October 26, 2001, plaintiff noted that he felt up and down, and Frederick Danziger, M.D. ("Dr. Danziger") found plaintiff exhibited no acute psychiatric complaints. (AR 379.) Dr. Danziger noted plaintiff's full, appropriate affect, impaired insight and judgment, and increased anger. (AR 379.) According to Dr. Danziger, plaintiff did not appear depressed despite his claims of severe depression. (AR 379.) Dr. Danziger diagnosed Bipolar Affective Disorder, mixed, most recent episode manic with psychotic features, and Personality Disorder, not otherwise specified with paranoid and passive/aggressive traits. (AR 379.) Dr. Danziger started plaintiff on Depakote 500 mg, discontinued Ambien 10 mg, and reduced Doxepin to 25 mg. (AR 379.) On November 29, 2001, plaintiff complained of nightmares, racing thoughts and hearing voices and expressed his desire to spend a lot of money which he believed he had. (AR 386.) Dr. Danziger noted plaintiff's pressured speech with intense, overly dramatic and somewhat inappropriate affect, and poor insight and judgment and that plaintiff was depressed and agitated. (AR 386.) Dr. Danziger assessed Bipolar Affective Disorder, mixed type, most recent episode manic with marked psychotic features, and Personality Disorder, not otherwise specified, with hysterical features. (AR 386.) Dr. Danziger discontinued Lithium Carbonate and Doxepin, increased Depakote to 500 mg, and prescribed Trazodone 100 mg and Zyprexa 10 mg. (AR 386.)

On January 8, 2002, plaintiff reported that he cannot work because of bipolar disorder and he is too sleepy all the time. (AR 384, 419, 458.) William Geiger, M.D. ("Dr. Geiger"), noted inability to resolve sleepiness in that plaintiff claims it started with Trazodone which was prescribed because he could not sleep and that a quarter pill of Trazodone "seems to work pretty well." (AR 384, 458.) Dr. Geiger found plaintiff "uncooperative in a very passive-aggressive manner," oriented in all spheres with intact memory, and not experiencing hallucinations or delusions. (AR 384, 458.) Dr. Geiger noted plaintiff's probable low normal intellect and impaired insight and judgment. (AR 384, 458.) Dr. Geiger assessed Bipolar Disorder, mixed, most recent episode manic, with psychotic features in remission on medication, and Personality Disorder not otherwise specified, with paranoid and passive-aggressive features. (AR 384, 458.) On April 9, 2002, plaintiff complained of sleep difficulty and racing thoughts to keep him awake but noted that he did not hear voices. (AR 416, 417.) Dr. Geiger noted that plaintiff

9

was alert, verbal cooperative and oriented in all spheres with intact memory and was not hypomanic. (AR 417.) Dr. Geiger found that plaintiff's insight and judgment seemed to be impaired and estimated plaintiff's intellect "as low normal or maybe borderline." (AR 417.) Dr. Geiger assessed Bipolar Disorder, mixed, most recent episode manic, and Personality Disorder not otherwise specified, with hysterical features. (AR 417.) Dr. Geiger continued Depakote 500 mg, Zyprexa 10 mg and Trazodone 50 mg. (AR 417.) Dr. Geiger instructed plaintiff to take his medications at 8 a.m. and 8 p.m. "because he has been so erratic with the times that he takes them that it makes it impossible to ascertain what effect the medications are having." (AR 417.) On May 22, 2002, plaintiff noted somewhat improved sleep and complained of sleepiness from Zyprexa 10 mg. (AR 415.) Dr. Geiger noted plaintiff's intact memory, low normal intellect, questionable judgment, absence of hallucinations or delusions, appropriate affect, and somewhat impaired insight and judgment. (AR 415.) Dr. Geiger assessed Bipolar Disorder, most recent episode manic with psychotic features, in remission on medications, and Personality Disorder, not otherwise specified with paranoia and passive aggressive features. (AR 415.) Dr. Geiger decreased Zyprexa to 2.5 mg and continued Depakote 500 mg and Trazodone 50 mg. (AR 415.)

On July 3, 2002, plaintiff reported to Jonathan Tatomer, M.D. ("Dr. Tatomer"), that plaintiff had difficulty to fall asleep at night and that voices had returned. (AR 414, 456.) Dr. Tatomer noted plaintiff's adequate memory and minimal insight and judgment and the absence of psychosis and disorientation. (AR 414.) Dr. Tatomer diagnosed Bipolar Disorder, most recent episode manic, with psychotic features, in partial remission, and Personality Disorder, not otherwise specified, with paranoia and passive/aggressive features. (AR 414.) Dr. Tatomer discontinued Zyprexa and Trazodone, continued Depakote 500 mg and started Geodon 20 mg at bedtime and instructed plaintiff to return in two weeks to address medication. (AR 414, 456.) Plaintiff missed his July 18, 2002 appointment with Dr. Tatomer, who noted the need to meet with plaintiff to address his medication. (AR 413.) On November 5, 2002, Dr. Tatomer again noted the need to meet plaintiff to address his medication. (AR 412.) On November 15, 2002, plaintiff informed Dr. Tatomer that medication was working well and that he had "no complaints" other than feeling a nurse had disrespected him. (AR 449.) Plaintiff mentioned his  SSI application and other disability issues. (AR 449.) Dr. Tatomer noted plaintiff "at

1  times will speak English." (AR 449.)  Dr. Tatomer further noted plaintiff's adequate memory and

2  Depakote level, average intelligence, absence of psychosis, and that plaintiff was neither depressed nor

3  anxious.  (AR 449.)  Dr. Tatomer diagnosed Bipolar Disorder, most recent episode manic, with

4  psychotic features, in partial remission, and Personality Disorder, not otherwise specified, with paranoia

5  and passive-aggressive features. (AR 449.) Dr. Tatomer continued Geodon 40 mg, Benadryl 50 mg and

6  Depakote 500 mg. (AR 449.)  According to notes with an undeterminable 2002 date, plaintiff's relative

7  indicated that plaintiff "is doing fine."  (AR 445.)  Further notes with an undeterminable 2002 date

8  reflect plaintiff's comment that he was not doing well, felt anxious, and required his sister's reminder

9  to shower. (AR 441.) On December 13, 2002, plaintiff reported to Dr. Tatomer that plaintiff "is doing

10  very well, his medications are working, he has no complaints, he would like them refilled."  (AR 439.)

11  Dr. Tatomer noted plaintiff's calmness, focus, ability to articulate his needs, intact memory, and reduced

12  insight and judgment, and absence of psychosis.  (AR 439.)  Dr. Tatomer assessed Bipolar Disorder,

13  most recent episode manic, and Personality Disorder, not otherwise specified, with paranoid and passive-

14  aggressive features. (AR 439.) Dr. Tatomer continued Geodon 40 mag, Benadryl 50 mg and Depakote

15  500 mg.  (AR 439.)  Dr. Tatomer concluded that plaintiff "continues to do well."  (AR 439.)

16        On January 15, 2003, Dr. Tatomer noted that other than sleep difficulty, none of plaintiff's

17  symptoms bother him in that plaintiff was not hearing voices, was not depressed and had good appetite.

18  (AR 435.)  Dr. Tatomer noted plaintiff's good memory, presumably average intelligence, and absence

19  of psychosis, depression, anxiety or manic behavior.  (AR 435.)  Dr. Tatomer assessed Bipolar Disorder,

20  most recent episode manic with psychotic features in partial remission, and Personality Disorder, not

21  otherwise specified, with paranoia and passive-aggressive features.  (AR 435.)  Dr. Tatomer continued

22  Geodon 40 mg and Depakote 500 mg and increased Benadryl to 50 mg.  (AR 435.)

23        Notes of an undeterminable 2003 date reflect that plaintiff attended a psychoeducation group

24  meeting to learn about mental illness and "is appealing his SSI application." (AR 431, 434.) Plaintiff's

25  participation in the group was appropriate and active.  (AR 431.)  Plaintiff noted problems of sleeping

26  all day and feeling in a bad mood when awake.  (AR 431.)

27                    ***Michael S. Barnett, M.D., Consultative Psychiatrist***

28        Michael S. Barnett, M.D. ("Dr. Barnett"), a board certified psychiatrist, conducted a consultative

examination and prepared a September 7, 2000 report.  (AR 292.)  Dr. Barnett noted that plaintiff drove 20 minutes to Dr. Barnett's office and "did not appear chronically mentally ill or have involuntary movements."  (AR 292.)  Plaintiff's chief complaints were that he does not "wake up early" and he feels "tired and weak."  (AR 292.)  Plaintiff denied ever experiencing manic symptoms and current psychotic symptoms, including auditory hallucinations and paranoia.  (AR 292.)  Plaintiff noted that he had neither follow-up care nor Lithium levels since his Mexican hospitalization and that he had been merely "taking his medicine for the last two years."  (AR 293.)

Dr. Barnett's mental status examination revealed that plaintiff was alert, talkative, well-groomed and cooperative and in "no acute psychic distress."  (AR 293.)  His speech was relevant, coherent and organized.  (AR 293.)  His mood and affect were euthymic.  (AR 293.)  His recent memory was intact.  (AR 293.)  Plaintiff displayed "no psychotic symptoms."  (AR 293.)

Dr. Barnett assessed plaintiff had "no current of psychotic or manic symptoms" and took "a lot of psychotropic medication."  (AR 293.)  Dr. Barnett attributed plaintiff's tired and weak feelings to over-medication of Haldol.  (AR 293.)  Dr. Barnett determined that '[t]here is no indication here from a psychiatric point of view that would impede Mr. Lozano's ability to work.  He probably had a brief psychotic reaction."  (AR 293.)

Dr. Barnett diagnosed a brief psychotic reaction and concluded:

> From a psychiatric point of view, Mr. Lozano would be able to understand, remember and carry out simple one or two-step job instructions.  He would be able to work regularly or perform work activities on a consistent basis.  He would *not* be able to engage in work activities without special or additional supervision.  He has no current psychiatric symptoms that would interfere with the completion of a normal work day or work week.  He would have no difficulty interacting with supervisors, coworkers or the public and coping with the stressors encountered in a normally competitive workplace.  (AR 294.)

Dr. Barnett's prognosis was "[g]uarded.  There is always the possibility that Mr. Lozano has a more serious underlying illness; however, though he currently has a lack of symptoms, he has not been followed up psychiatrically."  (AR 294.)

On April 30, 2003, Dr. Barnett noted that inclusion of "not" in italics above in his September 7, 2000 report "is a typographical error and should be removed."  (AR 428.)

/ / /

*Mental Residual Functional Capacity Assessment And Psychiatric Review Technique*

Archimedes Garcia, M.D. ("Dr. Garcia"), completed a November 6, 2000 Mental Residual Functional Capacity Assessment to conclude that plaintiff was generally not significantly limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation. (AR 296-297.) Dr. Garcia opined that plaintiff is able to: (1) understand and remember adequately and including short, simple instructions; (2) sustain concentration and persistence sufficiently to perform short, simple instructions; (3) perform activities within customary tolerances; (4) complete a normal workweek; (5) adapt to normal changes and hazards in a work setting; and (6) travel on his own. (AR 298.) Dr. Garcia further opined that plaintiff has no problem with normal social interaction as would be expected on a job site. (AR 298.) Dr. Garcia noted that plaintiff functions well and is expected to do so if he takes his prescribed medications. (AR 301.) Evelyn Aquino-Caro, M.D. ("Dr. Aquino-Caro"), affirmed Dr. Garcia's assessment. (AR 299.)

Dr. Aquino-Caro completed an April 9, 2001 Mental Residual Functional Capacity Assessment to conclude that plaintiff generally was not significantly limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation. (AR 302-303.) Dr. Aquino-Caro concluded that plaintiff retains ability and understanding for simple instructions and is able to concentrate for two hours and complete a task and to adapt to simple job situations. (AR 304.)

Dr. Aquino-Caro completed an April 9, 2001 Psychiatric Review Technique to note plaintiff's mild restriction of daily living activities, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace. (AR 309.) Dr. Aquino-Caro noted plaintiff's stable condition on current medications and ability to perform simple repetitive tasks. (AR 310.)

*Edmundo Ramos Chavez, Treating Psychiatrist*

Edmundo Ramos Chavez, M.D. ("Dr. Chavez"), wrote a brief October 15, 2002 letter to note plaintiff's June 7, 2002 and September 9, 2002 appointments, Bipolar Disorder II diagnosis, and treatment for years with psychotropics. (AR 423.) In a January 10, 2004 letter, Dr. Chavez noted that despite repeated efforts to work, plaintiff "has failed because of the continuous and rapid cycling mood, irritability, low frustration level and straight – aggressive interaction with peers. This makes a poor prognosis in competitive/full time work." (AR 470.)

13

*Medications*

Plaintiff's medications have included Lithium Carbonate 300 mg, Depakote 500 mg, Trazodone 100 mg, Ziprexa 10 mg, Clonazepam, Haloperidol, Lithobid 300 mg, Paxil 30 mg, Ambien 10 mg, Sinogan, Benztropine 2 mg, Haldol 5 and 10 mg, Neurontin 800 mg, Risperdal 3 mg, Doxepin 100 mg, Cogentin 2 mg, Depakote, Disphenhydramine and Geodon. (AR 150, 190, 193, 359, 409.)

**Plaintiff's Activities And Testimony**

***Plaintiff's Questionnaires And Statements***

Plaintiff completed an undated Disability Report Adult to claim that mental illness prevents him to follow conditions, directions and instructions. (AR 145.) Plaintiff stopped working December 5, 1998 after he was admitted to an Alameda County mental hospital due to an anxiety attack. (AR 145.)

Plaintiff completed an August 12, 2000 Daily Activities Questionnaire to note that on an average day, he gets up at 12 p.m. to 1 p.m. and sits around. (AR 165.) Plaintiff experiences trouble sleeping and bathes to relax and to "get more control" of himself. (AR 165.) Plaintiff neither cooks, shops nor performs household chores, and his sister cooks and shops and "does everything since I don't like to do anything." (AR 165.) Plaintiff enjoys watching sports on television. (AR 167, 168.) Plaintiff goes out of his home once or twice a week. (AR 167.) Plaintiff enjoys walking around the block and to a park. (AR 167, 168.) When plaintiff gets sick, he is hostile toward others. (AR 168.) Plaintiff prefers not being around people. (AR 168.) Plaintiff needs to move around and cannot be in one place for too long. (AR 168.) Plaintiff becomes frustrated to prevent him to complete tasks. (AR 169.) Plaintiff lacks desire to do or care for anything. (AR 169.) Plaintiff has lost jobs because of mental hospital stays. (AR 169.)

Plaintiff's sister completed an August 12, 2000 Daily Activities Questionnaire (Third Party Information) to note that plaintiff's normal sleeping hours are 10 p.m. to 1 p.m. (AR 171.) Plaintiff has difficulty falling asleep to require medication. (AR 172.) Plaintiff's sister prepares his meals and shops. (AR 172.) Plaintiff's sister "must do everything for him otherwise he will not do anything." (AR 172.) Plaintiff's sister handles "everything for him since he doesn't have the responsibility of doing it at all." (AR 173.) Plaintiff lacks desire to do anything. (AR 173.) Plaintiff enjoys watching sports and walking. (AR 173, 174.) Plaintiff usually recalls what he watched on television. (AR 174.) Plaintiff

1   talks to friends if he likes them.  (AR 174.)  Plaintiff has no trouble following instructions or finishing

2   a job but may change is his mind or lose desire to complete a task.  (AR 175.)  Plaintiff does not like to

3   be alone because he fears something will happen.  (AR 175.)

4        According to an undated Reconsideration Disability Report, plaintiff had been acting erratic,

5   claimed to be a great cowboy, acted strange, talked to himself, walked around much, and generated fear

6   that he might harm himself or his family.  (AR 177.)  Plaintiff feels desperate and his hands shake.  (AR

7   179.)

8        Plaintiff completed a January 12, 2001 Daily Activities Questionnaire to note that on an average

9   day he walks to a park but is mostly at home.  (AR 186.)  Plaintiff has difficulty falling asleep because

10  he thinks about people talking to him.  (AR 186.)  Plaintiff takes sleep medication.  (AR 186.)  Plaintiff

11  requires no help with his personal needs.  (AR 186.)  Plaintiff's sister performs all household chores,

12  including cooking and shopping for plaintiff.  (AR 187.)  Plaintiff is incapable to perform household

13  chores.  (AR 187.)  Plaintiff enjoys walking to the park and watching sports on television.  (AR 188.)

14  Plaintiff leaves his home twice a week to visit relatives.  (AR 188.)  Plaintiff is able to go out on his own

15  when he takes his medication.  (AR 188.)  Plaintiff has difficulty getting along with others because he

16  has a bad temper and becomes aggressive, violent and loud.  (AR 189.)  Plaintiff attends church twice

17  a month.  (AR 189.)  Plaintiff has different thoughts to thwart his concentration and completion of tasks.

18  (AR 190.)  Plaintiff is unable to follow verbal instructions and becomes frustrated.  (AR 190.)  Plaintiff's

19  condition causes fatigue and forgetfulness.  (AR 190.)  Plaintiff's condition prevents him to work.  (AR

20  190.)  Plaintiff has lost work because he became frustrated and his mind went crazy.  (AR 190.)

21       Plaintiff's friend completed a January 12, 2001 Daily Activities Questionnaire (Third Party

22  Information) to note that plaintiff spends a typical day walking to the park.  (AR 180.)  Plaintiff sleeps

23  eight to ten hours a day.  (AR 180.)  Plaintiff has difficulty sleeping.  (AR 181.)  Plaintiff's sister cares

24  for his personal needs, prepares his meals and shops for him.  (AR 181.)  Plaintiff performs no

25  household chores.  (AR 182.)  Plaintiff is unable to complete chores in that he forgets what he started.

26  (AR 182.)  Plaintiff leaves his home two or three times a week to walk to the park.  (AR 182.)  Plaintiff

27  has a drivers license but is unable to drive.  (AR 182.)  Plaintiff enjoys watching television, especially

28  sports, and walking.  (AR 182, 183.)  Plaintiff is unable to have a "regular" conversation because he gets

1   loud and mad.  (AR 183.)  Plaintiff attends church twice a month.  (AR 183.)  Plaintiff has difficulty

2   concentrating and remembering.  (AR 184.)

3   *Plaintiff's March 11, 2002 ALJ Hearing Testimony*

4   Plaintiff testified at the March 11, 2002 ALJ hearing that he needed one more semester to

5   complete high school in Mexico but was brought to the United States.  (AR 64.)  Plaintiff speaks little

6   English.  (AR 65.)

7   In the United States, plaintiff performed factory, restaurant and construction work, experienced

8   difficulties, but worked always with a bilingual foreman.  (AR 65.)  Plaintiff's condition prevents him

9   to return to his prior jobs.  (AR 77.)  Plaintiff does not work because of sleep problems and medication

10  causing him to sleep until noon or 1 p.m.  (AR 67.)  Plaintiff "cannot lead a normal life" and doesn't

11  "feel like doing anything."  (AR 67.)  Distraction, nervousness and inability to concentrate and to pay

12  attention prevent plaintiff to work and caused him to be fired.  (AR 67.)  Plaintiff has problems

13  concentrating and listening, and needs things repeated.  (AR 74.)

14  Plaintiff goes to bed at 9 p.m., takes sleeping medication but wakes up during the night to

15  interrupt sleep.  (AR 68.)  When plaintiff awakes late in the day, he feels as if he is sleep walking.  (AR

16  68.)

17  Plaintiff has been diagnosed with bipolar, schizophrenia and depression disorders.  (AR 68.)  As

18  to bipolar, plaintiff explained that he experiences high and low energy cycles.  (AR 68.)  During a high

19  energy cycle, plaintiff walks so much he gets blisters and is anxious.  (AR 68-69.)  During a low cycle,

20  plaintiff wants only to remain in bed.  (AR 69.)  Plaintiff last experienced high-low cycling during the

21  prior summer and later clarified that in the last year he had no high-low cycle.  (AR 69.)  Plaintiff's

22  current medication have decreased the highs and lows so that plaintiff is more in the middle.  (AR 70.)

23  Plaintiff's condition will require lifelong medication.  (AR 70.)  Plaintiff stopped taking lithium two

24  months prior to the hearing and feels the same as when he took it.  (AR 70, 71.)

25  Plaintiff claims to experience bipolar symptoms of laziness, body tiredness and "staring down

26  like in a daze."  (AR 71.)  When watching television, plaintiff becomes scared that something will

27  happen to him.  (AR 72.)  Plaintiff hears voices at night when awake and sometimes when dreaming.

28  (AR 77.)  Plaintiff does not recognize the voice which tells him something will happen to him.  (AR 78.)

1    Plaintiff was hospitalized in Alameda County in January 1999 and was admitted by someone
2    else. (AR 66, 75.) Plaintiff was later hospitalized for three weeks when he vacationed in Mexico. (AR
3    66.) Plaintiff claims that he does not drink and implied his Mexican hospitalization did not result from
4    partying. (AR 66.) Plaintiff was hospitalized in Mexico because he "was very accelerated and just
5    walking and walking" without sleep. (AR 76.) Plaintiff's family members admitted him to the Mexican
6    hospital. (AR 76.)

7    Plaintiff lives in a house with his parents, sister, brother-in-law and two children (who apparently
8    are his sister's children). (AR 73.) Plaintiff's father takes care of plaintiff, cooks plaintiff's food, and
9    gives plaintiff clothes and medication. (AR 73. 76.) Plaintiff's father makes sure plaintiff takes
10   medication day to day. (AR 76.) Plaintiff's sister shops for plaintiff and does dishes. (AR 79.) When
11   plaintiff awakes, he either lays or sits down or walks. (AR 78.) Plaintiff lacks the energy to help around
12   the home. (AR 79.)

13   Plaintiff has a valid California driver's license but does not drive because he lacks a car. (AR
14   79.) Plaintiff would accept an invitation to watch his favorite baseball team the Arizona Diamondbacks
15   play the Dodgers in Los Angeles. (AR 82.)

16   ***Testimony Of Plaintiff's Father At March 11, 2002 ALJ Hearing***

17   Plaintiff's father testified at the March 11, 2002 ALJ hearing that he has lived for plaintiff for
18   the past year. (AR 84.) Plaintiff's father makes sure that plaintiff takes his medication. (AR 85.)
19   Plaintiff's father sees plaintiff "with a lot of depression" and questions whether plaintiff's medication
20   is too strong in that plaintiff sleeps too long. (AR 86.)

21   ***Plaintiff's Testimony At August 7, 2003 ALJ Hearing***

22   Plaintiff testified at the August 7, 2003 ALJ hearing that he sees a psychiatrist because he goes
23   from one extreme to the other, hears voices, cannot sleep, gets sad and experiences varying feelings.
24   (AR 92.) Plaintiff remains ill despite taking medications, which cause his hands to shake infrequently.
25   (AR 92.) The shaking does not last long but prevents him to write or to hold a coffee cup without
26   spilling. (AR 94, 95.) Plaintiff told Dr. Tatomer about the shaking. (AR 97.)

27   When plaintiff becomes sad, he sometimes cries up to three or four hours, isolates and does not
28   want to get out of bed or leave his room. (AR 96.) Plaintiff experiences such feelings one or two days

1    a week.  (AR 96.)

2         Plaintiff lives with his sister and performs no household chores.  (AR 97.)  On a typical day,

3    plaintiff bathes, watches television, and reads the Bible for up to 10 minutes.  (AR 100.)  Once or twice

4    a day, plaintiff leaves his home to walk around "a little bit."  (AR 99.)

5         Plaintiff cannot "do one thing too long" and becomes distracted.  (AR 100.)  Plaintiff could not

6    perform a task for an hour before changing his mind and going on to a different task.  (AR 101.)

7    Plaintiff could perform a task for up to 30 minutes before putting his attention to something else.  (AR

8    102.)

9         A male friend visits plaintiff once a week for up to an hour.  (AR 103.)  Plaintiff has gone to his

10   friend's home and to the store with his friend.  (AR 103.)  Plaintiff sometimes goes to the park with his

11   nephew.  (AR 103.)  Plaintiff attends church with his family but does not talk with the priest or other

12   churchgoers.  (AR 104.)

13                                  **The ALJ's Findings**

14        In his September 9, 2003 decision, the ALJ identified the primary decision as whether plaintiff

15   is under a disability.  (AR 18.)  In concluding plaintiff is not disabled and thus not eligible for SSI (AR

16   24), the ALJ found:

17        1.    Plaintiff's bipolar disorder with psychotic features is a severe impairment but does not

18              meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R. Part404,

19              Subpart P, Appendix 1 ("Listing of Impairments").

20        2.    Plaintiff's allegations regarding his limitations are not totally credible.

21        3.    Plaintiff has the residual functional capacity to perform work without exertional

22              limitations and is able to understand, remember and carry out simple instructions with

23              ordinary supervision and to interact appropriately with others in worklike situations.

24        4.    Plaintiff is unable to perform his past relevant work.

25        5.    Plaintiff is unable to communicate in English.

26        6.    Plaintiff is not disabled considering the range of work at all levels which plaintiff is

27              capable functionally to perform and his age, education and work experience and using

28              section 204.00 of the Medical-Vocational Guidelines. 20 C.F.R., Part 404, Subpart P,

1    Appendix 2.  (AR 23-24.)

2    **DISCUSSION**

3    **Standard Of Review**

4    Congress has provided limited judicial review of a Commissioner's decision made through an

5    ALJ.  *See* 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ,

6    when the determination is not based on legal error and is supported by substantial evidence.  *See Jones*

7    *v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812

8    F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work

9    contrary to treating physician's findings).[1]   Substantial evidence is "more than a mere scintilla,"

10   *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance,

11   *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such

12   evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S.

13   at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

14   The record as a whole must be considered, weighing both the evidence that supports and detracts

15   from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is

16   substantial evidence to support the administrative finding, or if there is conflicting evidence that will

17   support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

18   *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than

19   one rational interpretation, the court may not substitute its judgment for that of the Commissioner.

20   *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th

21   Cir. 1999).

22   This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

23   is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

24   whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be

25   reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

26

27   [1]    "The district court properly affirms the Commissioner's decision denying benefits if it is supported by
28   substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

19

1    Plaintiff bears the burden to prove that he is disabled which requires presentation of "complete

2    and detailed objective medical reports of [his] condition from licensed medical professionals." *Meanel*

3    *v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

4    Plaintiff must furnish medical and other evidence about plaintiff's medical impairments.  20 C.F.R. §§

5    404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind

6    or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine

7    whether you are disabled or blind.  You are responsible for providing that evidence.")

8    _____Here, plaintiff claims disability since July 1, 2000 due to mental illness, including bipolar

9    disorder and schizophrenia.  (AR 136, 145.)

10    With these standards in mind, this Court turns to plaintiff's criticisms of the ALJ's September

11    9, 2003 decision.

12    **Dr. Zabiega's Opinion**

13    Plaintiff contends the ALJ insufficiently rejected Dr. Zabiega's opinion without supporting

14    evidence.  The Commissioner responds that the ALJ properly analyzed plaintiff's impairments.

15    A treating physician's opinion is not conclusive as to a claimant's physical condition or the

16    ultimate issue of disability and may be disregarded by the ALJ even when it is not contradicted.

17    *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir. 1989); *Magallanes*, 881 F.2d at751; *Matney*

18    *v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).[2]  An ALJ may reject a treating physician's opinion

19    whether or not it is contradicted, if the opinion is "brief and conclusory in form with little in the way of

20    clinical findings to support its conclusion."  *Magallanes,* 881 F.2d at 751.  Inconsistencies and

21    ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate

22    reasons to reject the opinion.  *Matney*, 981 F.2d at 1020.

23    The Ninth Circuit has further explained:

24    To reject the opinion of a treating physician which conflicts with that of an
      examining physician, the ALJ must "'make findings setting forth specific, legitimate

25    reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ
      can meet this burden by setting out a detailed and thorough summary of the facts and

26    _____

27    [2]    A treating physician's opinion is not conclusive as to claimant's disability as this ultimate issue is an
      administrative finding reserved to the Commissioner.  20 C.F.R. § 404.1527(e).  The Commissioner has final responsibility

28    to determine a claimant's residual functional capacity.  20 C.F.R. § 404.1546.

1    conflicting clinical evidence, stating his interpretation thereof, and making findings." .
2    . . The rule . . . does not apply, however, "when the nontreating physician relies on
     independent clinical findings that differ from the findings of the treating physician." . .
3    . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical
     tests, it must be viewed as substantial evidence . . .'"

4    *Magallanes*, 881 F.2d at 751(citations omitted.)

5         An ALJ may reject a treating physician's report based on a claimant's exaggerated claims. *See,*

6    *e.g., Sandgathe*, 108 F.3d at 980.  A physician's opinion of disability "premised to a large extent upon

7    claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints

8    have been "properly discounted." *Fair*, 885 F.2d at 605 (citing *Brawner v. Sec. of Health & Human*

9    *Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996),

10   *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able to find a link between

11   [claimant's] complaints and known medical pathologies").

12        "[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical

13   testimony, and for resolving ambiguities."  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

14   Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute

15   specific, legitimate reasons to reject the opinion.  *Matney*, 981 F.2d at 1020.

16        After he thoroughly reviewed the medical evidence, including Dr. Zabiega's assessment (AR 19-

17   21), the ALJ discounted Dr. Zabiega's opinion:

18        In evaluating the medical evidence, substantial weight is given to the treating Mental
          Health record as a whole.  These records show that the claimant has a diagnosis of
19        bipolar disorder, is currently fairly compliant with his medications, and has good control
          of his symptoms with medications.  Limited weight is given to Dr. Zabiega's June and
20        July 2001 assessments of the claimant's mental state and functional capacity.  Dr.
          Zabiega's conclusions were not supported by his own treatment notes, which showed that
21        by May 31, 2001 the claimant had a positive adjustment to medication changes made on
          May 11th. Further, Dr. Zabiega's characterization of the claimant, on May 11th, as manic
22        and unresponsive, is contradicted by the separate notes of the nurse who translated at the
          meeting.  These show that the claimant was alert and oriented, with good personal
23        hygiene and grooming (Exhibit 7F, p. 2).  Dr. Zabiega saw the claimant five times
          between September 2000 and May 2000 (Exhibits 6F, pp. 16, 19-21; 7F, p. 9).  Other
24        psychiatrists saw the claimant regularly in that period, and at approximately two month
          intervals afterwards, yet their notes do not show that the claimant was persistently
25        delusional or manic (Exhibits 6F, pp. 17-18, 21, 23-24; 7F, p. 21; 8F; 13F, pp. 6, 10, 20).
          Although Dr. Zabiega was one of the claimant's treating psychiatrists at the time of his
26        assessments, his opinions were not supported by objective evidence and consequently are
          not entitled to controlling weight.  (AR 21.)
27

28        The ALJ properly noted inconsistencies and ambiguities in Dr. Zabiega's assessment and notes

                                          21

1  to support giving "limited weight" to his assessment.  The ALJ properly referenced Dr. Zabiega's limited

2  treatment to further support the ALJ's discount of Dr. Zabiega's assessment.  An ALJ may discredit a

3  treating physician's opinion unsupported by the record as a whole or by objective medical findings.

4  *Baston v. Commissioner of Social Security Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004); *Rollins v.*

5  *Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (treatment notes "are not the sort of description and

6  recommendations one would expect to accompany a finding that [claimant] was totally disabled under

7  the Act."  The ALJ thoroughly detailed the facts and conflicting evidence, stated his interpretation of

8  them and made findings to support his discount of Dr. Zabiega's assessment.

9       On whole, the evidence supports a discount of Dr. Zabiega's assessment and reveals that plaintiff

10  was hospitalized in Alameda County in January 1999 after he had stopped taking his medications for

11  several months.  (AR 239.)  During the hospitalization, a medication regimen was renewed to improve

12  plaintiff's condition and to enable plaintiff to attend groups, outline a reasonable care plan, and be

13  appropriate with peers and staff, goal directed, and appropriate in thinking and conversation.  (AR 206.)

14  In April 2000, plaintiff was hospitalized in Mexico after he replaced his medication with alcohol.  (AR

15  256, 259.)  During his stay, plaintiff "improved markedly" and the notes reflect that plaintiff had a stable

16  sleep pattern, had no medication side effects, accepted his medication, was tranquil, coherent, alert,

17  cooperative, was neither irritable, aggressive nor impulsive, was aware of his condition, had neither

18  hallucinations nor delusions, and appeared asymptomatic.  (AR 250, 252, 253, 255, 257, 259.)

19       The record of Tulare County Mental Health Services, through which Dr. Zabiega treated plaintiff,

20  undermines Dr. Zabiega's broad ranging June 2001 assessment.  On September 11, 2000, plaintiff

21  reported that he was stable.  (AR 338.)  An intake form noted plaintiff's coherent speech, appropriate

22  content, adequate productivity, normal thought content, intellect, insight and judgment, and motivation

23  for treatment.  (AR 342-344.)  A September 11, 2000 care plan form suggested plaintiff's employability.

24  (AR 356.)  On October 18, 2000, Dr. Zabiega noted plaintiff's good expression, normal mood and affect,

25  and fair insight and judgment along with the absence of delusions, hallucination or paranoia.  (AR 333.)

26  On November 16, 2000, Dr. Zabiega noted that plaintiff "is doing very well" and "thinks the medications

27  are working well."  (AR 332.)  Dr. Zabiega noted plaintiff's informative speech, good expression,

28  normal mood and affect, fair insight and judgment, and absence of delusions, hallucinations and

1   paranoia.  (AR 332.)

2          On January 18, 2001, Dr. Zabeiga noted that plaintiff was "relatively stable on current

3   medications."  (AR 331.)  Dr. Zabeiga noted plaintiff's informative speech, good expression, normal

4   mood and affect and good judgment and insight and that plaintiff lacked delusions, hallucinations and

5   paranoia.  (AR 331.)  On March 19, 2001, Dr. Bong noted the absence of acute distress and agitation.

6   (AR 330.) On April 16, 2001, Dr. Bong noted plaintiff's fair relatedness, euthymic mood, linear thought

7   processes and absence of acute distress and agitation.  (AR 329.)  On May 11, 2001, plaintiff was

8   observed as "alert and oriented," and Dr. Zabeiga further noted plaintiff's goal directed speech, good eye

9   contact, euthymic mood, pleasant and bright effect and good insight and judgment as well as absence

10  of signs of psychotic or delusional disorder.  (AR 360, 328.)  On May 31, 2001, Dr. Zabeiga noted that

11  plaintiff "is doing relatively well" and that his condition is stable.  (AR 367.)  Dr. Zabeiga observed

12  plaintiff's alertness, cooperation, intact cognitive functions, goal-oriented speech, good eye contact, and

13  euthymic mood, pleasant and appropriate affect and good insight and judgment.  (AR 367.)  Dr. Zabeiga

14  noted the absence of signs of psychotic or delusional disorder.  (AR 367.)  On August 1, 2001, plaintiff

15  reported he felt better after stopping Neurontin and denied hearing voices.  (AR 369.)  On August 30,

16  2001, plaintiff voiced "no concerns" and was noted to be "fairly stable" on Lithium Carbonate and

17  Neurontin.  (AR 370, 371.)  On October 26, 2001, Dr. Danziger found plaintiff exhibited not acute

18  psychiatric complaints.  (AR 379.) According to Dr. Danziger, plaintiff did not appear depressed despite

19  his claims of severe depression.  (AR 379.)

20         On January 8, 2002, Dr. Geiger found plaintiff "uncooperative in a very passive-aggressive

21  manner," oriented in all spheres with intact memory, and not experiencing hallucinations or delusions.

22  (AR 384, 458.)  On April 9, 2002, Dr. Geiger noted that plaintiff was alert, verbally cooperative and

23  oriented in all spheres with intact memory and was not hypomanic.  (AR 417.)  Dr. Geiger noted

24  plaintiff's erratic medication times to contribute to issues.  (AR 417.)  On May 22, 2002, Dr. Geiger

25  noted plaintiff's intact memory and appropriate affect and the absence of hallucinations or delusions.

26  (AR 415.) On July 3, 2002, Dr. Tatomer noted absence of psychosis and disorientation.  (AR 414.)  On

27  November 15, 2002, plaintiff informed Dr. Tatomer that medication was working well and that he had

28  "no complaints" other than feeling a nurse had disrespected him.  (AR 449.)  Dr. Tatomer noted

1   plaintiff's adequate memory, average intelligence, absence of psychosis, and that plaintiff was neither

2   depressed nor anxious.  (AR 449.)  On December 13, 2002, plaintiff reported to Dr. Tatomer that

3   plaintiff "is doing very well, his medications are working, he has no complaints, he would like them

4   refilled." (AR 439.) Dr. Tatomer noted plaintiff's calmness, focus, ability to articulate his needs, intact

5   memory, and absence of psychosis.  (AR 435.)  Dr. Tatomer concluded that plaintiff "continues to do

6   well." (AR 439.)

7        On January 15, 2003, Dr. Tatomer noted that other than sleep difficulty, none of plaintiff's

8   symptoms bother him in that plaintiff was not hearing voices, was not depressed and had good appetite.

9   (AR 435.)  Dr. Tatomer noted plaintiff's good memory, presumably average intelligence, and no

10  evidence of psychosis, depression, anxiety or manic behavior.  (AR 435.)

11       The record reveals plaintiff had monthly or bimonthly appointments with Tulare County Mental

12  Health Services physicians who regulated plaintiff's medications.  The gist of the record is that

13  plaintiff's symptoms were minimized when he took his medications as recommended and that he was

14  hospitalized twice when he stopped taking his medications for extended periods.  The record fails to

15  support Dr. Zabiega's far reaching conclusions, and the ALJ fulfilled his duty to resolve conflicts and

16  ambiguities in the medical record.

17       Moreover, Dr. Barnett reached quite different conclusions than Dr. Zabeiga, as plaintiff

18  concedes, and Dr. Barnett's notations contradict plaintiff's claims and Dr. Zabiega's assessment.  Dr.

19  Barnett, a board certified psychiatrist, noted that plaintiff drove 20 minutes to Dr. Barnett's office and

20  "did not appear chronically mentally ill." (AR 292.) To Dr. Barnett, plaintiff denied experiencing manic

21  symptoms. (AR 292.)  Plaintiff informed Dr. Barnett that plaintiff had been compliant during the past

22  two years with his medication. (AR 293.) Dr. Barnett's mental status examination revealed that plaintiff

23  was alert, talkative, well-groomed and cooperative and in "no acute psychic distress."  (AR 293.)

24  Plaintiff displayed "no psychotic symptoms."  (AR 293.)  Dr. Barnett assessed that plaintiff had "no

25  current psychotic or manic symptoms" and attributed plaintiff's tired and weak feelings to over-

26  medication of Haldol.  (AR 293.)  Dr. Barnett determined that "[t]here is no indication here from a

27  psychiatric point of view that would impede Mr. Lozano's ability to work.  He probably had a brief

28  psychotic reaction."  (AR 293.)  Dr. Barnett concluded that plaintiff is capable to: (1) understand,

remember and carry out simple one or two-step job instructions; (2) work regularly or perform work activities on a consistent basis; and (3) engage in work activities without special or additional supervision.  (AR 294, 428.)  Dr. Barnett noted the absence of: (1) current psychiatric symptoms to interfere with completion of a normal work day or week; (2) difficulty to interact with supervisors, coworkers or pubic; and (3) coping with stressors encountered in a normally competitive workplace. (AR 294.)  Dr. Barnett's prognosis was "[g]uarded.  There is always the possibility that Mr. Lozano has a more serious underlying illness; however, though he currently has a lack of symptoms, he has not been followed up psychiatrically."  (AR 294.)

Dr. Barnett's consultative opinion is substantial evidence in that it is consistent with other independent evidence.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  "[T]o the extent [an examining consultative physician's] opinion rest on objective clinical tests, it must be viewed as substantial evidence that [claimant] is no longer disabled."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  "Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then the province of the ALJ to resolve the conflict."  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The ALJ properly accorded more weight to Dr. Barnett's well-documented examination which revealed plaintiff's mental state when he takes his psychotherapeutic medications.  (AR 22.)

As noted by the Commissioner, Dr. Garcia and Dr. Aquino-Caro, non-examining physicians, further supported the ALJ's finding that plaintiff's impairments did not produce functional limitations to preclude all work.  Dr. Garcia concluded that plaintiff was generally not significantly limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation. (AR 296-297.)  Dr. Garcia opined that plaintiff is able to: (1) understand and remember adequately and including short and simple instructions; (2) sustain concentration and persistence sufficiently to perform very short and simple instructions; (3) perform activities within customary tolerances; (4) complete a normal workweek; (5) adapt to normal changes and hazards in a work setting; and (6) travel on his own. (AR 298.)  Dr. Garcia further opined that plaintiff has no problem with normal social interaction as would be expected on a job site.  (AR 298.)  Dr. Garcia noted that plaintiff functions well and is

1    expected to do so if he takes his prescribed medications.  (AR 301.)

2        Dr. Aquino-Caro affirmed Dr. Garcia's assessment and concluded that plaintiff generally was

3    not significantly limited in understanding and memory, sustained concentration and persistence, social

4    interaction and adaptation.  (AR 299, 302-303.)  Dr. Aquino-Caro concluded that plaintiff retains ability

5    and understanding for simple instructions, and is able to concentrate for two hours and complete a task

6    and to adapt to simple job situations.  (AR 304.)

7        A non-examining physician's findings "can amount to substantial evidence, so long as other

8    evidence in the record supports those findings."  *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

9    When "an opinion of a nontreating source is based on independent clinical findings that differ from those

10   of a treating physician, the opinion of the nontreating source may itself be substantial evidence; it is

11   solely the province of the ALJ to resolve the conflict."  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.

12   1995).  As outlined above, evidence in the record supports Dr. Garcia and Dr. Aquino-Caro's findings

13   to accord them weight of substantial evidence.

14       Plaintiff fails to persuade this Court that the ALJ improperly rejected Dr. Zabiega's assessment

15   or erred as to plaintiff's residual mental function.

16                          **Medication Side Effects**

17       Plaintiff argues that the "ALJ, without basis, discounted the significance of the side effects of

18   his medications by finding that the effects 'are not constant' and therefore allow him to perform 'the

19   ordinary manipulative activities of unskilled work.'"

20       After outlining plaintiff's testimony about side effects, the ALJ acknowledged side effects but

21   discounted their degree, as alleged by plaintiff:

22       The claimant does have side-effects from his medications; however, his testimony
         indicates that these are not constant, and that he would be able to perform the ordinary
23       manipulative activities of unskilled work.  The claimant's credibility is lessened by
         indications in the treating record that he has occasionally been non-compliant with
24       medications, and that these occasions have led to increased psychiatric symptoms: the
         hospitalization at Alameda Medical Center (Exhibit 1F, p. 37); the hospitalization in
25       Mexico (Exhibit 2F, pp. 3, 12), and the current treating record (Exhibit 6F, p. 22; 7F, pp.
         5, 11-12).  Further, although the claimant denied the use of alcohol, the Mexican
26       hospitalization record is clear that the claimant had not been taking his medications, and
         had been "partying."  (AR 22-23.)

27

28       As noted by the Commissioner, Dr. Zabeiga, relied upon by plaintiff, did not base his far

                                         26

1  reaching conclusions on medication side effects. (AR 314-324.) In fact on November 16, 2000, Dr.

2  Zabeiga noted that plaintiff "is doing very well" and "thinks the medications are working well." (AR

3  332.)  On January 18, 2001, Dr. Zabeiga noted that plaintiff was "relatively stable on current

4  medications." (AR 331.)  On August 30, 2001, plaintiff voiced "no concerns" and was noted to be

5  "fairly stable" on Lithium Carbonate and Neurontin. (AR 370, 371.) On January 8, 2002, Dr. Geiger

6  questioned plaintiff's sleepiness based on the inconsistency that plaintiff claims sleepiness started with

7  Trazodone which was prescribed because plaintiff could not sleep and that a quarter pill of Trazodone

8  "seems to work pretty well." (AR 384, 458.)  On April 9, 2002, Dr. Geiger instructed plaintiff to take

9  his medications at 8 a.m. and 8 p.m. "because he has been so erratic with the times that he takes them

10  that it makes it impossible to ascertain what effect the medications are having." (AR 417.)  On

11  November 15, 2002, plaintiff informed Dr. Tatomer that medication worked well and that he had "no

12  complaints." (AR 449.) On December 13, 2002, plaintiff reported to Dr. Tatomer that plaintiff "is doing

13  very well, his medications are working, he has no complaints, **he would like them refilled**." (AR 439;

14  bold added.)  Plaintiff missed appointments with Dr. Tatomer to specifically address his medication.

15  (AR 412, 413.)  Plaintiff's physicians adjusted medications to accommodate plaintiff. (AR 329, 331,

16  370, 371, 384, 414, 415, 456.)

17      Plaintiff points to no meaningful error in the ALJ's assessment of medication side effects. The

18  ALJ properly questioned plaintiff's credibility to discount side effects. As outlined above, the record

19  reveals questions as to whether the sporadic side effects were genuine and their duration, especially

20  plaintiff's vague, generally undocumented claims of infrequent shaking hands.  (AR 92, 94, 95.)

21  Interestingly, plaintiff's alleged side effects as his SSI application and claim were processed to negate

22  further his claims.  The ALJ properly resolved conflicts and ambiguities regarding side effects.

23                                    **CONCLUSION AND ORDER**

24      For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

25  properly concluded plaintiff is not disabled. This Court further finds the ALJ's decision is supported by

26  substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this

27  Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff SSI or to

28  remand for further proceedings. This Court DIRECTS the Court's clerk to enter judgment in favor of

1   defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff Jose Lozano and

2   to close this action.

3        IT IS SO ORDERED.

4   **Dated:    April 6, 2006**                         **/s/ Lawrence J. O'Neill**
    66h44d                                              UNITED STATES MAGISTRATE JUDGE